**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

JOSIE SAMANTHA HART                                                    PLAINTIFF

v.                                            CIVIL ACTION NO. 3:24-CV-489-JHM

DAVID PUCKETT, *et al.*                                              DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on the motions for summary judgment filed by Defendants Jerry Collins and David Puckett and Defendant Aaron Green (DNs 25, 26).  Plaintiff Josie Samantha Hart has filed a "Motion for Final Judgment" (DN 29), which is reproduced and submitted as a response to Defendants' motions for summary judgment.  (DN 30).  Defendants have replied to Plaintiff's submissions.  (DNs 31, 32).  For the reasons that follow, Defendants' motions for summary judgment will be granted, and Plaintiff's motion for final judgment will be denied.

**I. BACKGROUND**

Plaintiff filed this *pro se* 42 U.S.C. § 1983 action against Defendants alleging violations of her constitutional rights arising out of a period of pretrial detention at the Louisville Metro Department of Corrections (LMDC).  (DN 1).

Plaintiff, a transgender female, alleges that she was sent to LMDC following her arrest, where Defendants Collins and Puckett placed her in a "single cell" on the "male side" of the jail after receiving information confirming Plaintiff's female name and gender.  (DN 1, PageID.4; DN 6).  She states that these Defendants "never placed me back on female side," despite identification listing her gender as female.  (DN 1, PageID.4).  Plaintiff alleges that at some point during her incarceration, LMDC classification changed her gender from female to male "for no

reason[,] allowing male guards to strip search me." (*Id*., PageID.5). She states that that she remained in a single cell for 17 months and "[took] a plea deal just to get out." (*Id*.). Plaintiff avers that these actions violated her First, Eighth, and Fourteenth Amendment rights. (*Id.*).

Plaintiff also alleges that Defendant Green imposed cruel and unusual punishment against her by "putting me on razor restrictions for no reason," and "never allowing me to go to [general] population." (*Id*.).

Pursuant to 28 U.S.C. § 1915A, the Court screened Plaintiff's complaint and permitted Fourteenth Amendment due process claims to proceed against Defendants Collins, Puckett, and Green in their individual capacities based on her allegations that Collins and Puckett wrongfully classified Plaintiff as male, resulting in her being housed on the male side of the LMDC and being strip-searched by male guards, and that Green placed her on razor restrictions and denied her access to general population. (DN 8).

**A.**

In their motion for summary judgment, Defendants Collins and Puckett argue that Plaintiff fails to prove she was housed in administrative segregation without due process, fails to assert a cognizable injury under the Prison Litigation Reform Act (PLRA), and fails to support her claims concerning strip searches by male officers. Collins and Puckett further argue that Plaintiff does not establish sufficient involvement by either Defendant in Plaintiff's classification or in any strip searches to invoke supervisory liability. Finally, Collins and Puckett assert they are entitled to qualified immunity. (DN 25-1, PageID.173-184). In support of their motion, Defendants Collins and Puckett submit the following evidence: Plaintiff's release report; LMDC Identification Bureau notification of Plaintiff's name and gender change; sworn affidavits of Defendant Puckett and non-party LMDC employee Meagan Kilkelly; LMDC's Gender Nonconforming Classification and

2

Classification Assessment Policies; Plaintiff's Offender Notes; and Plaintiff's medical records. (DN 27-1 through DN 27-8).

Defendant Green seeks summary judgment on the grounds that Plaintiff fails to identify any portion of the record, or present any affirmative evidence, demonstrating that Green was responsible for placing Plaintiff on a razor restriction; she failed to exhaust administrative remedies as required by the PLRA; and she does not establish a violation of her constitutional due process rights. Green also argues that he is qualifiedly immune from suit. (DN 26-1, PageID.190-199). As evidence, Green submits his sworn affidavit and Plaintiff's Offender Notes. (DNs 26-2 through DN 26-3). Where relevant, Green incorporates by reference the evidence, arguments, and authorities put forward by Defendants Collins and Puckett in their motion for summary judgment.

**B.**

In Plaintiff's response and "Motion for Final Judgment," she asserts that: (1) her gender is female for legal and medical purposes and that she has previously been incarcerated as such; (2) she is not a "predator" nor did she indicate to LMDC officials that she feared for her safety; (3) she suffered harassment by LMDC staff regarding her gender/sexual identity; (4) she was strip-searched and frisked by male officers; (5) LMDC staff altered the documents identifying her gender; (6) she was placed on razor restriction "for no reason on multiple occasions to try to hurt me;" (7) on one occasion she "acted . . . suicidal trying to get moved to different areas" which resulted in her staying in isolation for 155 days and locked down for up to 23.5 hours per day; (8) she does not have male genitalia "and even if [she] did it was court ordered . . . that [she be] moved to the female side" of the jail; and (9) she remained in a single cell for 17 months "hurt and alone." (DNs 29, 30).

3

Plaintiff previously submitted a pretrial memorandum, which the Court also considers.  To her memorandum she attaches a Kentucky Uniform Citation; LMDC Identification Bureau notification of Plaintiff's name and gender change; internal LMDC e-mail confirming name and gender change; and one page of Offender Notes.  (DN 23).

**C.**

In their reply, Defendants Collins and Puckett assert that Plaintiff cannot defeat the motion for summary judgment, nor is she entitled to judgment in her favor because her submissions are unsworn and unsupported by evidence, do not reference the record or cite to case law, and contain no facts or arguments beyond the initial complaint.  (DN 31, PageID.305-310).  They cite the Court's previous Order setting forth the summary judgment rule and providing Plaintiff guidance on how to respond.  (DN 28).  According to Collins and Puckett, Plaintiff's lack of proper response renders their motion for summary judgment unopposed and her claims waived.  (DN 31, PageID.309).  They also reiterate their arguments that Plaintiff's claims fail as a matter of law and that they are entitled to qualified immunity.  (*Id.*, PageID.310-313).  Defendant Green's reply is substantially similar in all material respects.  (DN 32).

**II. LEGAL STANDARD**

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts

4

demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Celotex*, 477 U.S. at 324). The non-moving party's evidence is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56. "The liberal treatment of *pro se* pleadings does not require lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted). The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a *pro se* litigant does not alter [this] duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010). However, "courts should consider the allegations in a *pro se* prisoner's verified complaints (which are effectively affidavits) before entering judgment against him[.]" *Miller v. Jones*, 483 F. App'x 202, 203 (6th Cir. 2012) (citing *Williams v. Browman*, 981 F.2d 901, 902–04, 905 (6th Cir. 1992)).

## III. DISCUSSION

### A.

The following facts are drawn from the parties' submissions and are undisputed unless otherwise noted.

Plaintiff was housed at LMDC as a pretrial detainee from August 30, 2022, to January 5, 2024. (DN 27-1). Plaintiff was booked into LMDC under the name "Josiah Hart" and was initially classified as male. On November 4, 2022, Plaintiff's name was changed to "Josie Hart" and gender changed to female within LMDC's systems. (DN 27-2).[1] A security decision was made, however, to place Plaintiff in administrative segregation in a single cell on the male side of the facility. (DN 27-3). Defendant Puckett's affidavit states that this determination was made by the Special Management Unit (SMU) Committee upon learning that Plaintiff had not fully transitioned from male to female insofar as she possessed male genitalia. Because Plaintiff presented a security risk to the safety of female inmates in the female unit and to her own safety in the male unit, single-cell administrative segregation in the male unit "was the only safe place she could be housed." (*Id.*; *see also* DN 27-4 [Kilkelly Aff.]).

Puckett attests that LMDC received credible information that Plaintiff was still at least partially biologically male. (*Id.*; DN 27-4). During a previous incarceration in 2022, Plaintiff had been classified as female and placed in a single cell on the female side of LMDC. However, during that same period of incarceration, Plaintiff was observed masturbating from which it was discovered that she possessed male genitalia. (*Id.*; DN 27-4). According to Puckett, while not every transgender inmate who has not fully transitioned presents a sufficient security risk to be

---

[1] Plaintiff states that she was initially booked into LMDC as female and LMDC "later changed her gender in their official records to male." (DN 23, PageID.152). Plaintiff's submissions are unsworn and the assertions of fact are unsupported by citations to the record. Notwithstanding the leniency afforded to *pro se* litigants, the Court may disregard any unsworn statement of fact. *See Zainalian v. Memphis Bd. of Educ.*, 3 F. App'x 429, 431 (6th Cir. 2001).

housed in administrative segregation, Plaintiff was identified as a heightened risk because of her "antisocial and predatory behavioral history at LMDC" during previous periods of incarceration. (*Id.*).  Additionally, Plaintiff represented both a security risk to other inmates and a target for violence were she to be housed with the general male population.  (*Id.*).  Puckett states that the SMU Committee regularly reviewed the Plaintiff's status and determined that her placement was appropriate.  (*Id.*).

The LMDC Gender Nonconforming Classification Policy No. 4-1.02 defines "transgender" as "[a] person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth."  (DN 27-5, PageID.221).  The General Guidelines state that when a transgender or intersex individual is identified while in custody, "LMDC Staff shall question the individual to identify genital status . . . . in a respectful and confidential manner."  (*Id.*, PageID.222).  Pursuant to this policy, LMDC staff is prohibited from "search[ing] or physically examin[ing] a transgender or intersex inmate for the sole purpose of determining the inmate's genital status."  If unknown, genital status "may be determined during conversations with the inmate, by reviewing medical records, or, if necessary, by learning that information as part of a broader medical examination conducted in private by a medical practitioner."  (*Id.*).

As to Housing Assignments, Policy No. 4-1.02 provides that "[a]ll transgender and intersex inmates shall be classified based on security and safety needs, and housing availability."  (*Id.*, PageID.222).  Additionally,

> In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, LMDC shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

(*Id*.). This policy also allows for protective custody for transgender inmates where "there is reason to believe the inmate presents a heightened risk to themselves, to others or when the inmate fears they may become victimized in general population." (*Id*., PageID.223). "Every thirty (30) days, LMDC shall afford each inmate a review to determine whether there is a continuing need for separation from the general population." (*Id*.).[2]

Plaintiff's Offender Notes reveal that on August 30, 2022, she was initially placed in a single cell per "mental health" and required administrative segregation due to "inmate being transgendered" and having a "history of being in a single cell." (DN 27-7, PageID.230). On September 27, 2022, Plaintiff requested protective custody. Puckett denied that request as she was currently in administrative segregation "due to being transgender and fearing for [her] safety." (*Id*., PageID.232). Puckett indicated that he would address her request at the next SMU meeting when her status would be reviewed. (*Id*.).

The following month, Plaintiff requested to have her classification changed from male to female, consistent with her legal documentation. Puckett noted that this would have to be directed to LMDC records staff, and that Plaintiff had not yet completed transitioning to female but once that occurred, Plaintiff's status might be changed. (*Id*., PageID.233).

An LMDC Identification Bureau memorandum dated November 4, 2022 ("Notification of additional and/or correctional information"), notified multiple LMDC departments, including records and classification, the Jefferson County District Court Clerk, Circuit Court Clerk, and

---

[2] Defendants Collins and Puckett refer to LMDC's Special Management Unit Policy, *see* DN 25-1, PageID.168-69, which purportedly governs the SMU and administrative segregation. However, the policy that is cited and attached as an exhibit—Policy No. 05-1.02, Classification Assessment—does not appear to contain these provisions. (DN 27-6).

8

Pre-trial Services Department of Plaintiff's name change from Josiah S. Hart to Josie Samantha Hart and gender change from male to female. (DN 27-2).

On November 5, 2022, Classification Coordinator Meagan Kilkelly directed that Plaintiff be moved to a female cell, the day after the Identification Bureau memorandum was issued changing Plaintiff's name and gender in LMDC's systems. (DN 27-7, PageID.236). However, that move was cancelled before it was implemented. Notes reflect that although Plaintiff was listed as female in the "XJail system," a body scan during Plaintiff's arrest revealed the presence of male genitalia. (*Id*., PageID.237). Kilkelly explains in her affidavit that Plaintiff "was identified as female in LMDC's electronic management system because that is how she identifies herself, however, this is not determinative of her housing situation." (DN 27-4).

From November 2022 to January 2024, Plaintiff made multiple requests to have her classification and/or housing assignment changed. Puckett denied Plaintiff's requests, citing Kilkelly's assignment of Plaintiff to the current housing location, Plaintiff's special housing needs, safety concerns, and the fact that she still possessed male genitals and had not yet completed the physical transition to female. (DN 27-7, PageID.238, 240-247).[3] Plaintiff's segregation status was reviewed by the SMU Committee. (*Id*., PageID.231, 234, 242).

Plaintiff's private medical records reveal that Plaintiff had an orchiectomy performed in April of 2021. (DN 27-8, PageID.275). During a June 18, 2021, consultation for gender-affirming vaginoplasty surgery, the examining physician noted that Plaintiff had a circumcised phallus and prior orchiectomy. The doctor opined that Plaintiff was "not able to give informed consent for this major operation at this time[,]" noting observing that Plaintiff's answers to questions were "fairly incongruent" and "a mismatch between her level of attention and the seriousness considering major

---

[3] While Plaintiff primarily requested to be moved to the female side of the jail, she apparently requested to be placed in the male general population on at least two occasions.

surgical intervention." (*Id*., PageID.292-294).  Additional private medical records reveal that in February of 2022, Plaintiff was status-post orchiectomy and "want[ed] to have surgery in future." (*Id*., PageID.276-79).  On April 6, 2022, Plaintiff was observed to have normal appearing genitalia with testes absent bilaterally.  (*Id*., PageID.287).

During a mental health visit at LMDC on November 15, 2022, Plaintiff told the provider that "she is upset because 'they got me over here with males and I have female parts.'  [Patient] stated she did not have a penis, however reports she wouldn't let medical look at her because they don't like her." (*Id*., PageID.254).  The following day, an LMDC medical provider noted:

> [Patient] is upset due to being on the male side, states she had penis removed. [R]eviewed notes[;] still has penis, had bilateral orchiectomy in the past and explained this to [patient] on reasoning why she is housed on male side.  [Patient] was seen masturbating to staff in the past while on J2 and had to be moved.

(*Id*., PageID.265) (cleaned up).  Another medical note from the same date indicates that Plaintiff reported to the provider that she "has a vagina," but "refused to have genital area assessed."  The provider "reviewed notes and patient had a bilateral orchiectomy in the past.  [E]xplained to [patient] that since she still has a penis and was found masturbating to staff in the past, she would still be housed on male side no matter how she identifies at this time." (*Id*., PageID.272).

An LMDC mental health note entry dated April 12, 2023, shows that Plaintiff "understands she can't be housed around men.  [Patient] states that she has had her testicles removed and she should be housed with the women but doesn't want to be and she dislikes medical and refuses to let them touch her." (*Id*., PageID.250).  In May 2023, Plaintiff demanded to be moved to female segregation.  The provider noted that Plaintiff "has an extensive [history] of exposing self to others and admits to indecent exposure in the past during this interaction." (*Id.*, PageID.252).

During a medical visit at LMDC on November 10, 2023, Plaintiff reported that she had her penis removed, however, medical notes indicated that she did not but did have a bilateral

orchiectomy in the past.  Plaintiff declined to have her genital area assessed during the visit.  (*Id.*, PageID.265).  On the same date, Plaintiff reported to the LMDC mental health provider that "while 'anatomically male,' [patient] prefers to be called a female due to 'receiving surgery' and self-identification as such."  (*Id.*, PageID.262).

**B.**

**1. Defendants Collins and Puckett**

Plaintiff challenges her placement in a single cell and in administrative segregation on the male side of LMDC on due process grounds.[4]  (DN 1, 6).  Defendants Collins and Puckett argue that they are entitled to summary judgment because there is no genuine dispute as to whether Plaintiff received due process.  (DN 25-1, PageID.173-176).

In support of their argument, Collins and Puckett cite to *Sandin v. Conner*, 515 U.S. 472 (1995), for the proposition that a prisoner is entitled to the protections of due process only when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" or "will inevitably affect the duration of [her] sentence," 515 U.S. 472, 487, and to *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983) (*abrogated on other grounds by Sandin*, 515 U.S. at 484), which observed the need for periodic reviews when a prisoner is placed in extended administrative segregation.

In the Sixth Circuit, whether the *Sandin* "hardship test" governs the procedural due process claims of pretrial detainees is unsettled.  *See Johnson v. Grayson Cnty., KY Det. Ctr.*, No. 21-5772, 2022 WL 3479501, at *2 (6th Cir. May 27, 2022) (observing that "several of our sister circuits

---

[4] While Plaintiff's complaint alleged being strip-searched by male officers, she stated no additional facts pertaining to the searches in her complaint or any subsequent submissions.  There is no Fourth Amendment claim before the Court, so Plaintiff's gender identity, the gender of the guards conducting the searches, and the fact of the searches being conducted are considered as part of her broader due process claim.

have held that *Sandin*'s atypical and significant hardship standard does not govern procedural due process claims brought by pretrial detainees" but the Sixth Circuit has "no precedent deciding this issue either way.") (citing *Dilworth v. Adams*, 841 F.3d 246, 252 (4th Cir. 2016) (collecting cases)); *see also Cornett v. Webb*, No. CIV.A. 02-400, 2004 WL 3437504, at *5 (E.D. Ky. May 13, 2004) (recognizing "some issue" as to whether *Sandin* applies to pretrial detainees and collecting cases).

Some courts in this Circuit have applied *Sandin* in determining whether a liberty interest is implicated by a pretrial detainee's administrative segregation. *See, e.g.*, *Polk v. Parnell*, 132 F.3d 33 (6th Cir. 1997) (short stay in disciplinary segregation was not such an atypical and significant hardship as to create a liberty interest requiring due process); *Webb v. Bucholtz*, No. 1:20-CV-1036, 2021 WL 804721, at *3 (W.D. Mich. Mar. 3, 2021) (finding that detainee's 10-month placement in segregation failed to implicate a liberty interest entitling him to due process); *Elliot v. Conner*, No. 3:23-CV-01008, 2023 WL 7545036, at *3 (M.D. Tenn. Nov. 13, 2023) (evaluating whether segregation of detainee from the general jail population involves the deprivation of a liberty interest under *Sandin*). Other courts have considered whether the segregation amounts to "punishment" under *Bell v. Wolfish*, 441 U.S. 520, 536 (1979). *See, e.g.*, *Evans v. Bonner*, No. 18-2726-JDT-CGC, 2019 WL 5269103, at *4-5 (W.D. Tenn. Oct. 17, 2019) (detainee's allegation that he was kept in administrative segregation without reason stated a viable due process claim under *Bell*); *Bennett v. Woosley*, No. 4:22-CV-34-CRS, 2023 WL 8705413, at *3 (W.D. Ky. Dec. 15, 2023) (pretrial detainee's segregation did not amount to punishment, reasoning that "[p]rison officials may segregate pretrial detainees for security purposes."); *Montgomery v. Gentry*, No. 3:20-CV-00406, 2020 WL 14009839, at *4 (M.D. Tenn. Dec. 11, 2020) (pretrial detainee's complaint alleging that his housing classification to administrative

12

segregation allowed the inference of an intent to punish under *Bell*).[5]  The Court finds that on the present record, Plaintiff's claim fails under both *Sandin* and *Bell,* as discussed below.

Mere placement in administrative segregation is "not an atypical and significant hardship, as intended by *Sandin*."  *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995).  Courts generally consider the nature and duration of a stay in segregation in determining whether it imposes an atypical and significant hardship.  *See Harden-Bay v. Rutter*, 524 F.3d 789, 795-96 (6th Cir. 2008).  The Sixth Circuit also considers the following factors, in their totality, when determining whether an inmate's segregation implicates a liberty interest by imposing atypical and significant hardship: (1) the reasons for an inmate's continued confinement in segregation; (2) the conditions of an inmate's confinement "'in relation to the ordinary incidents of prison life'"; and (3) the impact the confinement will have on the inmate's sentence.  *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998) (quoting *Sandin*, 515 U.S. at 472, 483).

Without any factual development or citation to record evidence, Plaintiff states only that she "had no contact with humans at all for 155 days and I was locked down for 23 to 23.5 hours a day for a chance to shower." (DN 29).  The 155 days Plaintiff spent in administrative segregation, standing alone, is insufficient to trigger a liberty interest.  *See, e.g., Baker*, 155 F.3d at 813 (finding that segregation for 30 months did not create a liberty interest violative of due process); *Bradley v. Evans*, 229 F.3d 1150, 2000 WL 1277229, at *5-7 (6th Cir. Aug. 23, 2000) (14 months of segregation did not constitute an atypical and significant hardship); *Collmar v. Wilkinson*, No. 97–4374, 1999 WL 623708, at *3 (6th Cir. Aug. 11, 1999) (neither eight months

---

[5] One district court, in observing that "[t]here is some question as to whether *Sandin* provides the proper measure for changes in the conditions of confinement for pretrial detainees[,]" suggested that *Sandin*'s hardship test could arguably be "flexible enough to address the conditions of confinement for pretrial detainees." *Lyons v. Barry Cnty. Jail*, No. 1:24-CV-1162, 2025 WL 262142, at *8 (W.D. Mich. Jan. 22, 2025).  For example, "for pretrial detainees, the test could evaluate whether the deprivation is atypical and significant in relation to the normal incidents of life in pretrial detention." *Id.* at *8-9 (finding that pretrial detainee failed to state a due process claim regardless of the standard employed).

administrative segregation nor 14 days disciplinary segregation was atypical and significant); *Albiola v. Pugh*, No. 4:14-CV-1645, 2015 WL 1915289, at \*6 (N.D. Ohio Apr. 27, 2015) (137-day segregation).  Other than the fact of isolation, Plaintiff does not allege facts describing the conditions of her segregation, much less conditions that (1) differ "'in relation to the ordinary incidents of prison life'" or (2) differ from conditions experienced by other segregated inmates. *See Sandin*, 515 U.S. at 484, 487; *see also, Baker*, 155 F.3d at 813.  Plaintiff therefore does not raise a triable issue of fact as to whether her administrative segregation presented an atypical and significant hardship under *Sandin*.  *See Freeman v. Troutt*, No. 3:10-CV-0697, 2012 WL 5439160, at \*8 (M.D. Tenn. Nov. 7, 2012) (pretrial detainee "failed to offer any evidence comparing his administrative confinement 'to the ordinary incidents of prison life' and thus "failed to create a genuine dispute of material fact as to whether his 97 or 98–day segregation imposed an 'atypical and significant hardship'").

Under *Bell*, a pretrial detainee can establish that he or she was subjected to unconstitutional punishment by showing either (1) "an expressed intent to punish on the part of the detention facility officials," or (2) that "a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose." *J.H. v. Williamson Cnty.*, 951 F.3d 709, 717 (6th Cir. 2020) (citing *Bell*, 441 U.S. at 535; *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). Thus, "a defendant does not violate a pretrial detainee's rights if the defendant has a legitimate governmental objective for imposing the restrictions or conditions." *Patton v. Shelby Cnty. Sheriff's Office*, No. 2:20-cv-2438, 2021 WL 3891588, at \*4 (W.D. Tenn. Aug. 31, 2021) (citing *Martucci v. Johnson*, 944 F.2d 291, 294 (6th Cir. 1991)).

While Plaintiff asserts that she has "not once in my entire life ever been a predator," and "at no given time did I say I was afraid [or] scared for my life" (DN 29), the evidence plainly

14

contradicts these unsworn statements. Plaintiff's institutional and medical records indicate, *inter alia*, an "extensive history of exposing self to others," and "[suicidal ideations] subsequent to gender dysphoria." (DN 27-8, PageID.252, 262). As to the rationale for Plaintiff's single-cell, administrative segregation placement, LMDC's Classification Coordinator Meagan Kilkelly attests that Plaintiff was identified as a "heightened risk because of her antisocial and predatory behavioral history at LMDC." (DN 27-4). Plaintiff was further determined to be too great of a risk to be placed in the general population. She could neither be housed with men as she was a "a potential target for victimization," nor with women due to presenting a security risk to female inmates and possessing male genitalia. (*Id.*). Plaintiff's unsworn and unsupported statement cannot serve to create a genuine issue of material fact that Plaintiff's administrative segregation was not rationally related to the legitimate governmental objectives of safety and security. *See generally, Jones v. City of Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017) ("[C]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment."). Because Plaintiff's placement in administrative segregation was not punitive in nature, her due process claim must fail, and summary judgment is warranted in favor of Defendants Collins and Puckett. *See Martucci*, 944 F.2d at 294 (finding that pretrial detainee's segregated confinement for security reasons was not impermissible punishment because it was reasonably related to a legitimate government objective); *Bennett*, 2023 WL 8705413, at *3 (uncontroverted evidence showed that detainee's segregation was not punitive and was reasonably related to the legitimate governmental objective of ensuring the safety and security of jail, staff, and other inmates).

The Court also addresses Plaintiff's apparent argument she should be classified and assigned housing at LMDC consistent with her identification documents, medical and jail records,

15

and social history recognizing her gender as female.  However, "Courts have held that prisoners generally do not have a liberty interest in avoiding being transferred to another prison, or in being housed in a particular institution." *Eagle v. Wash. State Dep't of Corr.*, No. 2:24-CV-01388-JCC-BAT, 2025 WL 270555, at *4 (W.D. Wash. Jan. 21, 2025), *report and recommendation adopted*, 2025 WL 660621 (W.D. Wash. Feb. 28, 2025) (citing *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983), and *Meachum v. Fano*, 427 U.S. 215, 225–27 (1976)).  This precedent has been applied in the context of transgendered inmates.  *See id.* (male-to-female transgender inmate had no liberty interest in being housed in a women's facility); *see also, e.g.*, *Millhouse v. Gill*, No. 2:25-CV-491, 2026 WL 266441, at *2 n.2 (S.D. Ohio Feb. 2, 2026) (any Fourteenth Amendment due process claim pertaining to transgender inmate's housing assignment would be subject to dismissal for failure to state a claim) (citing *Eagle*, 2025 WL 270555, at *4)); *Aliahmed v. Troxler*, 839 F. App'x 675, 677 (3d Cir. 2021) (transgender plaintiff lacked a cognizable liberty interest in being confined in a particular institution and was thus unlikely to succeed on claim for injunctive relief seeking transfer to women's prison); *Gordon v. Inslee*, No. 3:21-CV-5802-BJR-DWC, 2023 WL 2874062, at *8–9 (W.D. Wash. Feb. 6, 2023), *report and recommendation adopted*, 2023 WL 2864187 (W.D. Wash. Apr. 10, 2023) (granting defendants' motion for summary judgment on transgender prisoner's due process claim based on the failure to transfer her to a women's prison on the grounds that plaintiff had no liberty interest in being housed in any particular prison or with any particular cellmate); *Minor v. Tome*, No. CV225579MASLHG, 2023 WL 2401511, at *3 (D.N.J. Mar. 8, 2023) (dismissing inmate's due process claim on initial review, acknowledging the absence of binding precedent establishing a rule that "it is improper to ever house a transgender inmate in a male prison," and that "persuasive precedent instead suggests that there is no clearly established law setting forth rules for the housing and placement of transgender inmates") (citing *Minor v.*

*Dilks*, No. 19-18261, 2022 WL 3369707, at \*6 (D.N.J. Aug. 16, 2022)).  Thus, to the extent

Plaintiff's due process claim is based upon the propriety of her placement relative to her gender

identity, it too would fail as a matter of law.

Accordingly, Defendants Collins and Puckett are entitled to summary judgment on

Plaintiff's Fourteenth Amendment due process claim pertaining to classification and segregation.

As such, the Court need not reach these Defendants' remaining contentions.

### 2. Defendant Green

Plaintiff alleges that Defendant Green imposed cruel and unusual punishment by placing

her on razor restrictions "for no reason" and "never allowing [her] to go to [general] population."

(DN 1, Page.ID.5).[6]

Defendant Green argues that he is entitled to summary judgment because Plaintiff does not

raise a genuine dispute as to Green's personal involvement in the alleged deprivation, fails to

demonstrate exhaustion of administrative remedies, and does not establish a constitutional

violation.  Additionally, Green argues that he is entitled to qualified immunity.  (DN 26-1,

PageID.191).  Plaintiff's response states only that "they put me on razor restriction for no reason

on multiple occasions to try to hurt me."  (DNs 29, 30).  Regardless of the theory under which

Plaintiff seeks to pursue her claim concerning her razor restriction, she fails to establish a

constitutional infirmity.

Of the record evidence, an entry dated September 29, 2022, in Plaintiff's Offender Notes

reads "[Plaintiff] was denied a razor due to comments about using the razor to cut private parts."

(DN 26-3, PageID.202).  Another note dated October 14, 2022, states, "Inmate was [placed]

(10/1/22) at the request of Lt. Stansfield [sic] as when inmate went to return a razor after razor

---

[6] Plaintiff's claim of being denied access to general population is subsumed by her due process claims based on classification and housing, which have been dismissed for the reasons set forth above.

call, the blade was missing and above stated [s]he didn't know where it was." (*Id*., PageID.203). On October 25, 2022, Timothy Stanfield wrote, "Inmate can be removed from razor restriction on 11/1/22. That would be a 30 day restriction." (DN 27-7, PageID.236).

The next relevant entry is dated August 29, 2023, and shows that Puckett inquired as to whether Plaintiff, who was on razor restriction until November 20, 2023, could shave under observation by a staff member. (DN 26-3, PageID.206). Green apparently responded that, "Inmate is on a razor restriction until 11/20 due to an incident. When an inmate is on razor restriction, they absolutely do not receive a razor. If they are needing to shave, they will need to wait until gym time or request to utilize hair clippers from gym time." (*Id*.). On September 1, 2023, a comment states that, "inmate was allowed to use a razor under officer supervision." (*Id*., PageID.206). The record also reflects at least two placements on suicide watch due to suicidal ideation and self-harm. (DN 26-3, PageID.204-205; DN 27-8, PageID.250-263).

First, under a due process analysis, Plaintiff fails to set forth facts or cite evidence suggesting that razor restriction was an atypical and significant hardship under *Sandin*. *See, e.g., Bean v. McQuiggin*, No. 2:07-CV-113, 2008 WL 4151351, at *6 (W.D. Mich. Sept. 2, 2008) (plaintiff's allegations did not show that permanent razor restriction imposed an atypical and significant hardship); *Cates v. Brennan*, No. 2:06-CV-109, 2006 WL 1625316, at *3 (W.D. Mich. June 7, 2006) ("[S]hower and razor restriction for 30 days does not constitute an atypical and significant hardship."). And despite her unsupported assertions that she was placed on razor restriction for "no reason" and "to hurt" her, the record evidence shows that the razor restriction was implemented for non-punitive, *i.e.*, safety and security reasons. *See Bell*, 441 U.S. at 539 ("[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is

18

punishment that may not constitutionally be inflicted upon detainees."); *see also*, *Bennett*, 2023 WL 8705413, at *4 (detainee's enhanced security measures, including sack lunches and frequent cell searches, were constitutionally permissible where uncontroverted evidence showed they were imposed not for punishment but for safety and security).  Thus, Plaintiff has not raised a genuine dispute as to whether the razor restriction violated her due process rights.  *See generally,* *Gooden v. City of Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment.").

Plaintiff's claim likewise fails under a Fourteenth Amendment conditions- of-confinement/deliberate indifference analysis.  *See generally, Bensfield v. Murray*, No. 4:21-CV-P104-JHM, 2022 WL 508902, at *2 (W.D. Ky. Feb. 18, 2022) (The Fourteenth Amendment applies to conditions-of-confinement claims brought by pretrial detainees and requires a showing of: (1) conditions of incarceration posing a substantial risk of serious harm to the plaintiff, and (2) that defendants acted deliberately and recklessly in the face of an obvious or known, unjustifiably high risk of harm.) (citations omitted).

Plaintiff has not alleged an "extreme deprivation" which deprived her of the "minimal civilized measure of life's necessities."  *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004) (citations omitted).  "With respect to access to laundry services, showers, and razors, the Constitution only requires that prisoners be allowed to maintain hygiene."  *Pann v. Hadden*, No. 1:22-CV-76, 2022 WL 765494, at *14 (W.D. Mich. Mar. 14, 2022) (citing *Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003)).  Plaintiff does not allege facts suggesting that she was unable to maintain hygiene, and the record shows that Plaintiff was able to shave under staff observation.  *See Polk v. Parnell*, 132 F.3d 33 (6th Cir. 1997) (table) (upholding grant of

19

summary judgment where the plaintiff's "allegations that the defendants . . . provided insufficient razors for shaving . . . fail even to state a claim for an Eighth Amendment violation."); *Bean*, 2008 WL 4151351, at *8 (prisoner's placement on permanent razor restriction failed to state a claim under the Eighth Amendment where he did not "allege or show that he was denied basic human needs and requirements.").[7]  Accordingly, Plaintiff fails to state a viable claim of unconstitutional conditions stemming from her razor restriction, and Defendant Green is entitled to summary judgment on this claim.  Having found that summary judgment is warranted in Green's favor for these reasons, the Court need not reach his remaining contentions.

### IV. CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** that Defendants' motions for summary judgment (DNs 25, 26) are **GRANTED**, and Plaintiff's "Motion for Final Judgment" (DN 29) is **DENIED**.

The Court will enter a separate Judgment dismissing the action.

Date:    May 14, 2026

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc:    Plaintiff, *pro se*
       Counsel of record
4414.015

---

[7] The objective prong of a conditions-of-confinement claim, which requires a showing of a substantial risk of serious harm, is the same under both the Eighth and Fourteenth Amendments. *Mitchell v. Phillips*, No. 5:24-CV-P53-JHM, 2024 WL 4729313, at *2 (W.D. Ky. Nov. 8, 2024) (citing *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022)).